IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARY J. SARVINO,**

      **Plaintiff,**

  v.                                  **Civil Action 2:16-cv-792**
                                            **Judge James L. Graham**
                                            **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Mary J. Sarvino, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB"). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner and Administrative Law Judge ("ALJ") under Sentence Four of § 405(g).

I.    **BACKGROUND**

    A.    **Procedural History**

Plaintiff applied for a period of disability and DIB on March 5, 2013, alleging disability beginning January 16, 2013 at the age of fifty-six, due to numerous physical and mental impairments. (Doc. 11-2, Tr. 13 at PAGEID #: 54). Her application was denied initially on September 23, 2013, and upon reconsideration on December 10, 2013. (*Id.*). An Administrative Law Judge (the "ALJ") held a hearing on March 10, 2015, after which she denied benefits in a written decision on May 14, 2015. (*Id.*). That decision became final when the Appeals Council

denied review on June 22, 2016. (*Id.*, Tr. 2, PAGEID #: 43). Plaintiff filed this case on August 16, 2016 (Doc. 1), and the Commissioner filed the administrative record on November 21, 2016 (Doc. 11). Plaintiff filed a Statement of Specific Errors on January 5, 2017, and requested oral argument. (Doc. 12). The Commissioner responded on February 21, 2017 (Doc. 13), and Plaintiff replied on March 7, 2017 (Doc. 14). In response to Plaintiff's request, the Court held oral argument on March 28, 2017. (*See* Doc. 20).

  **B.**  **Relevant Hearing Testimony**

During the hearing before the ALJ, Plaintiff testified that she had worked as a "heavy handler of packages. . . ." (Doc. 11-2, Tr. 47 at PAGEID #: 89). She indicated that "[m]ost of [her] jobs were labor-like jobs," which involved dealing with trays of mail, pulling carts, and shipping. (*Id.*). However, for three years, she worked at a "sit-down job" doing "correspondence-type work." (*Id.*, Tr. 48 at PAGEID #: 90). As to her mental health, Plaintiff testified that she has difficulty with her memory, which has worsened over time. (*Id.*, Tr. 61 at PAGEID #: 103).

Dr. Richard Oestreich testified as the vocational expert ("VE"). (*Id.*, Tr. 69 at PAGEID #: 111). He stated that Plaintiff had past relevant work as a shipping and receiving clerk (SVP 5, skilled and medium), and as a mail sorter (SVP 2, sedentary and unskilled). (*Id.*, Tr. 70–71 at PAGEID #: 112–13).

When first asked if an individual with Plaintiff's residual functional capacity ("RFC") could perform past relevant work as a shipping and receiving clerk or as a mail sorter, he responded "I don't think so." (*Id.*, Tr. 72 at PAGEID #: 114). He elaborated that she could not perform such work because "there's too much verbal in both . . . it's about understanding the words and being able to find out from someone else what the words might mean." (*Id.*).

2

However, when the ALJ clarified that the communication limitation she proposed related to "the ability to actually speak," the VE changed his testimony, stating "[t]hen I think she can do that work, your honor." (*Id*.). But the VE equivocated, testifying that if the mail sorter job had production quotas, Plaintiff "certainly couldn't do it." (*Id*., Tr. 73 at PAGEID #: 115).

The ALJ then asked the VE if a hypothetical individual with Plaintiff's RFC and age, education, and work history could perform other work. (*Id*., Tr. 74 at PAGEID #: 116). The VE testified that she could and provided the following examples:

> First would be cleaner, 381.687-014, it's medium and unskilled, there'd be about 500 in her area that she could do, that's central Ohio, about 20,000 in the state, and 200,000 nationally. Inspector, 589.686-038, about 450 in her area, 18,000 in the state, and 250,000 nationally. Hand packager, 920.587-018, 600 in her area, 16,000 in the state, and 150,000 nationally.

(*Id*.). The VE testified that the job numbers he provided were "usually from the Bureau of Labor Statistics or derivatives of that." (*Id*., Tr. 81 at PAGEID #: 123).

### C. Relevant Medical Background

The relevant medical evidence consists of reports from consultative examiner Dr. Kent Rowland, Ph.D. and evaluating neurologist Philip Rick Whatley, Ph.D. In a Disability Assessment Report, Dr. Rowland stated that Plaintiff obtained a Full-Scale IQ score of 79, which placed her in the eighth percentile and in the borderline range. (Doc. 11-7, Tr. 397 at PAGEID #: 445). He compared Plaintiff's borderline IQ score to her average Wechsler Memory Scale-Fourth Edition ("WMS") scores, noting that her "WMS scores were significantly higher than would be expected given her Full Scale IQ score of 79." (*Id*., Tr. 398 at PAGEID #: 446). Dr. Rowland concluded that the disparity between Plaintiff's IQ score and her WMS scores is suggestive of a cognitive impairment of a general type, which is "impacting . . . her general abilities to reason and calculate." (*Id*.). Noting that Plaintiff "evidenced significant difficulties

3

focusing attention and concentration throughout the interview and testing," Dr. Rowland opined that she "can be expected to struggle to understand and apply instructions in a work setting" and "may have periodic and erratic performance on multi-step tasks." (*Id*., Tr. 399 at PAGEID #: 447; *see also id*. (finding also that Plaintiff may have "limitations in her ability to conform to social expectations in a work setting" based on her "depressed mood").

Consistent with Dr. Rowland's findings, Dr. Whatley found Plaintiff's Full-Scale IQ score was in the borderline range and her WMS scores were in the average range. (*Id*., Tr. 540–41 at PAGEID #: 588–89).  Dr. Whatley speculated initially that Plaintiff's memory loss was "secondary to her psychiatric/psychological/stress factors," but he conducted a comprehensive neuropsychological evaluation consisting of sixteen tests to obtain additional information. (*Id*., Tr. 538, 545–46 at PAGEID #: 586, 593–94). Dr. Whatley's impression upon testing was that Plaintiff's "protocol is most consistent with pseudodementia secondary to severe psychiatric illness." (*Id*., Tr. 546 at PAGEID #: 594; *see also id*. (noting Plaintiff's poor performance on measures of symptom validity/effort was likely due to "psychiatric factors rather than malingering *per se*")).  Among other recommendations, Dr. Whatley found that Plaintiff "is likely going to need to apply for long-term disability.  She shows signs of severe psychiatric illness.  She does not appear to be a candidate for the work force." (*Id*., Tr. 547 at PAGED #: 595).

### D.    The ALJ's Decision

The ALJ found that Plaintiff meets the Social Security Act's insured status requirements through December 31, 2018, and that she has not engaged in substantial gainful activity since the alleged onset date of January 16, 2013.  (Doc. 11-2, Tr. 14 at PAGEID #: 56).  The ALJ likewise determined that that Plaintiff suffers from numerous physical impairments and mental

impairments that include affective disorders, borderline intellectual functioning, and cognitive disorder not otherwise specified, but she does not have an impairment or combination of impairments that meets or equals a listed impairment. (*Id*., Tr. 14–16 at PAGEID #: 56–58). The ALJ determined Plaintiff has the RFC to:

> perform medium work as defined in 20 CFR 404.1567(c), except that the claimant can never climb ladders, ropes, or scaffolds. She can perform jobs that do not expose her to workplace hazards, such as unprotected heights or dangerous machinery. She can perform jobs that do not require her to administer verbal instructions regarding safety concerns and she can communicate through talking on an occasional basis. From a mental standpoint, the claimant can perform simple, routine, repetitive tasks without a fast pace, thus precluding assembly line work, work with strict production quotas, and piecework. The claimant can perform jobs that do not require contact with the public but can interact occasionally and on a superficial basis with coworkers and supervisors, where superficial means that the claimant can respond to requests involving the exercise of simple judgment only. The claimant can adapt to changes in work duties after the initial training period but instructions may need to be repeated once or twice.

(*Id*., Tr. 18–19 at PAGEID #: 60–61).

In making the RFC determination, the ALJ gave "partial weight" to Dr. Rowland's functional assessment because she found that it understated Plaintiff's limitations. (*Id*., Tr. 23 at PAGEID #: 65). The ALJ noted Dr. Rowland's observation that Plaintiff was tangential and difficult to follow, but she also found that Plaintiff did not evidence extreme or aberrant behavior. (*Id*.). The ALJ likewise acknowledged Dr. Rowland's observation that Plaintiff had difficulty comprehending directions and had to have tasks explained to her on multiple occasions, but she also noted that Plaintiff was observed to have focused attention and was cooperative. (*See id*.).

Similarly, the ALJ gave "partial weight" to Dr. Whatley's opinion only "to the extent that the assessment supports a greater restriction in the claimant's mental functioning than what was found by Dr. Rowland." (*Id*., Tr. 24 at PAGEID #: 66). However, the ALJ gave "no weight" to

his opinion that Plaintiff was unable to work due to her psychological limitations, finding it inconsistent with other record evidence. (*Id*.).

The ALJ looked to the hearing testimony of the VE and determined that Plaintiff is capable of performing past relevant work. (*Id*., Tr. 26 at PAGEID #: 68). However, she found alternatively that there are other jobs in the national economy that Plaintiff is able to perform, considering Plaintiff's RFC and the relevant vocational factors. (*Id*.). The ALJ determined that the VE's testimony concerning the existence of jobs was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id*., Tr. 27 at PAGEID #: 69). Based upon the foregoing, the ALJ determined that Plaintiff has not been under a disability as defined in the Social Security Act from January 16, 2013 to the date of the decision, and the ALJ denied benefits. (*Id*., Tr. 28 at PAGEID #: 70).

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To that end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

Even if the ALJ's decision satisfies the substantial evidence standard, "a decision of the

Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)).

### III. DISCUSSION

In her Statement of Specific Errors, Plaintiff argues that the ALJ failed to properly consider the opinions of consultative examiner Dr. Rowland and evaluating neurologist Dr. Whatley. (Doc. 12 at 8, PAGEID #: 761). Plaintiff argues further that, even if that error is excused, the ALJ also erred in failing to address the inconsistencies between the VE's testimony and the DOT. (*Id.*).

#### A. Consideration Of Expert Opinions

In formulating the RFC, the ALJ must consider all relevant evidence, including medical opinions, which relate to the severity of a plaintiff's impairments. 20 C.F.R. § 404.1527(c). The weight given to a medical opinion depends upon a variety of factors. For example, "the more consistent a medical opinion is with the record as a whole, the more weight" it is given. 20 C.F.R. § 404.1527(c)(4). Further, an examining physician's opinion is entitled to more weight than a non-examining physician's opinion, 20 C.F.R. § 404.1527(c)(1), and a specialist's opinion regarding issues related to the specialty is entitled to more weight than a non-specialist's opinion, 20 C.F.R. § 404.1527(c)(5). *See, e.g.*, *Hamilton v. Comm'r of Soc. Sec.*, No. 2:14-cv-2784, 2015 WL 5118140, at *3 (S.D. Ohio Sept. 1, 2015) ("In evaluating the opinion of a nontreating source,

an administrative law judge should consider such factors as 'the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty.'" (quoting *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)).

As set forth above, the ALJ found that "[f]rom a mental standpoint," Plaintiff's RFC included the ability to:

> perform simple, routine, repetitive tasks without a fast pace, thus precluding assembly line work, work with strict production quotas, and piecework.  The claimant can perform jobs that do not require contact with the public but can interact occasionally and on a superficial basis with coworkers and supervisors, where superficial means that the claimant can respond to requests involving the exercise of simple judgment only.  The claimant can adapt to changes in work duties after the initial training period but instructions may need to be repeated once or twice.

(Doc. 11-2, Tr. 18–19 at PAGEID #: 60–61).  Plaintiff concedes that the ALJ's RFC "is fairly detailed," but she claims it is flawed in several respects.  (Doc. 12 at 10, PAGEID #: 763).  In Plaintiff's view, the most fundamental flaw is that the ALJ considered the opinions of Dr. Rowland and Dr. Whatley "*in isolation from each other* without considering that they consistently described Plaintiff as more limited than the ALJ's RFC describes, particularly with regard to her ability to meet the basic mental demands of competitive employment." (*Id.* at 11–12, PAGEID #: 763–64 (emphasis in original)).  Plaintiff also argues that the ALJ failed to assign appropriate weight to those opinions, given Dr. Rowland's specialty in psychology and Dr. Whatley's specialty in neurology.  (*Id.* at 12, PAGEID #: 764).

Although not entirely clear, the ALJ's decision seems to suggest that she accepted Dr. Rowland's opinion but imposed additional limitations in her RFC beyond those he provided. (Doc. 11-2, Tr. 23–24 at PAGEID #: 65–66) ("The limitations noted by Dr. Rowland have been considered and incorporated into the residual functional capacity, set forth above, with additional

limitations noted."). Specifically, the ALJ gave "partial weight" to Dr. Rowland's functional assessment because it "that it somewhat understate[d] the claimant's limitations in light of her presentation as well as other evidence in the medical record." (*Id*., Tr. 23 at PAGEID #: 65). However, the ALJ's characterization of the weight she assigned to Dr. Rowland's opinion is inconsistent with the decision's plain language—which disregards Dr. Rowland's determinations concerning Plaintiff's ability to stay on task and perform relative to simple instructions. (*See, e.g.*, *id*. ("Although she tended to be a bit tangential and difficult to follow, she did not evidence extreme or aberrant behavior."); *see also id*. ("It was noted that she had some difficulty comprehending some directions and two tasks had to be explained to her on multiple occasions. However, she also showed focused attention and appeared cooperative.")). Indeed, the ALJ acknowledged Dr. Rowland's opinion that Plaintiff "could be expected to struggle to understand and apply instructions in a work setting" and "may have periodic and erratic performance on multi-step tasks," but restricted the impact of that limitation to Plaintiff's ability to "adapt to changes in work duties after the initial training period. . . ." (*Id*., Tr. 19, 23 at PAGEID #: 61, 65).

The ALJ made a similar finding concerning Dr. Whatley's opinion. Again, she assigned "partial weight" only "to the extent that the assessment supports a greater restriction in the claimant's mental functioning than what was found by Dr. Rowland." (*Id*., Tr. 24 at PAGEID #: 66). However, the ALJ gave "no weight" to Dr. Whatley's opinion that Plaintiff was unable to work due to her psychological limitations, finding it "wholly inconsistent with the claimant's presentation during other evaluations, including Dr. Rowland's evaluation examination and treatment notes from the claimant's primary care physician." (*Id*.).

Here, Dr. Rowland and Dr. Whatley reached similar conclusions concerning Plaintiff's

9

psychological functioning. Both Dr. Rowland and Dr. Whatley found Plaintiff had a borderline IQ and average WMS scores, which were indicative of a cognitive impairment. (*See* Doc. 11-7, Tr. 397–98, 540–41 at PAGEID #: 445–46, 588–89). Dr. Rowland and Dr. Whatley likewise reached similar conclusions relevant to Plaintiff's ability to understand, remember, and execute simple instructions in light of her impairment. (*See, e.g.*, *id.*, Tr. 399 at PAGEID #: 447 (Dr. Rowland's opinion that Plaintiff "can be expected to struggle to understand and apply instructions in a work setting" and "may have periodic and erratic performance on multi-step tasks"); *id.*, Tr. 543, 547 at PAGEID #: 591, 595 (Dr. Whatley's observations that Plaintiff has "[d]ifficulty concentrating," "a marked decrease in concentration," "increased distractibility," and is not "a candidate for the work force"). The ALJ should have recognized that consistency and weighed the opinions accordingly, *see* 20 C.F.R. § 404.1527(c)(4), but it is not clear that she did so. Similarly, the ALJ should have considered that they were examining physicians opining on limitations related to their specialties, *see* 20 C.F.R. § 404.1527(c)(1), (c)(5), but the Court is unable to discern if she engaged in that analysis. Because it is unclear if the ALJ engaged in the required analysis pertaining to consistency and specialty in the related field, remand for further consideration of the first assignment of error is warranted. *See, e.g.*, *Shackelford v. Comm'r of Soc. Sec.*, No. 1:10-cv-604, 2011 WL 4351607, at *13 (S.D. Ohio Aug. 24, 2011) (remanding where the ALJ's decision did not reflect an analysis of the § 404.1527 factors, including "the medical specialty of the source" and "how consistent the opinion is with the record as a whole").

### B. Inconsistencies Between The Vocational Expert's Testimony And The Dictionary Of Occupational Titles

Plaintiff's second assignment of error begins with step four of the sequential evaluation process, which requires Plaintiff to prove that she is incapable of performing past work. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Plaintiff argues that, even if the RFC is correct, the

ALJ erred at step four in failing to address the inconsistencies between the VE's testimony and the DOT as required by Social Security Ruling ("SSR") 00-4p. (Doc. 12 at 16, PAGEID #: 769). As the Sixth Circuit has explained:

> On occasion, a VE's testimony conflicts with the information set forth in the DOT. In an effort to insure that such actual or apparent conflicts are addressed, the Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided 'conflicts with [the] information in the DOT.' S.S.R. 00-4p, 2000 WL 1898704, at *4. ALJs must also 'obtain a reasonable explanation for . . . apparent conflict[s]' if the VE's evidence 'appears to conflict with the DOT.'

*Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009) (alterations in original).

At the hearing, the VE testified that Plaintiff had past relevant work as a mail sorter, which he identified as "DOT 521.687-086, sedentary, unskilled SVP 2." (Doc. 11-2, Tr. 71 at PAGEID #: 113). There is no dispute that the VE's testimony and the ALJ's findings concerning Plaintiff's ability to work as a mail sorter are confusing (*see, e.g.*, Doc. 20 at 18, PAGEID #: 830 (defense counsel's concession during oral argument that "the ALJ's discussion" on this issue "could have been more clear"), and that the DOT number for mail sorter provided by VE and adopted by the ALJ corresponds to the entirely different job of "nut sorter" (*see* Doc. 12 at 17, PAGEID #: 770 (citing http://www.occupationalinfo.org/52/521687086.html); Doc. 11-2, Tr. 26 at PAGEID #: 68). Nevertheless, Defendant maintains that, "even if the step four finding was erroneous," the ALJ properly made a step five finding by relying on the VE's testimony that there are a significant number of jobs that Plaintiff could perform. (Doc. 20 at 18, PAGEID #: 830).

Indeed, the ALJ's error at step four may constitute harmless error if substantial evidence supports her conclusion at step five that Plaintiff possesses the vocational qualifications to perform specific jobs. *See Welch v. Astrue*, No. 1:10CV1434, 2011 WL 4632922, at *3 (N.D.

Ohio Sept. 30, 2011).  At step five, the ALJ had the burden to show that, even if Plaintiff is unable to perform past work, she can work at jobs within the restrictions of her RFC considering the vocational factors of age, education, and prior work experience.  *Id.* at *4 (citing *Foster*, 279 F.3d at 354).  During oral argument, Defendant conceded that one of three jobs found suitable by the VE and the ALJ—the position of cleaner—has a heavy exertional level that exceeds the medium work specified by the ALJ's RFC.  (Doc. 20 at 18, PAGEID #: 830).  Defendant likewise conceded that a second job found suitable by the VE and the ALJ—the position of hand-packager—may be inappropriate under the RFC.  (*Id.* (stating that it's unclear if "that the specific function of starting, stopping and regulating speed" of the conveyor-belt in this assembly-line job exceeds the RFC)).  Thus, the sole job relied upon by Defendant in arguing harmless error at step five is the third job found suitable by the VE and the ALJ—the position of inspector.  (*Id.* at 19, PAGEID #: 831 ("Your Honor, our position is that the step five finding is entirely clear because there is one job that—at the very least, the one job, the inspector's job, that Plaintiff could perform.")).

Although the VE and the ALJ referred to the relevant job as "inspector," the associated DOT number is for a "rug-inspector helper," which is described as follows:

> Assists RUG INSPECTOR (tex. prod., nec) in examination of felt rug pads: Examines felt and points out imperfections.  Straightens material to ensure even rewinding.  Helps lift finished roll to wrapping machine.  Places pipe or bar in winding rack, and starts new roll of padding.  Helps RUG INSPECTOR (tex. prod., nec) cut material to specified length.  Performs other duties as described under HELPER (any industry) Master Title.

*See* http://www.occupationalinfo.org/58/589686038.html.  Thus, in order to find harmless error, the ALJ must have satisfied her burden of demonstrating that "rug-inspector helper" position exists in significant number in the local and national economies.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) ("At step five, the Commissioner must identify a significant

12

number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile.").

"The determination of what constitutes a significant number of jobs is determined on a case-by-case basis;" that is, there is no "magic number." *Smathers v. Comm'r of Soc. Sec.*, No. 2:14-cv-500, 2015 WL 5568324, at *3 (S.D. Ohio Sept. 22, 2015); *see also Cunningham v. Astrue*, 360 F. App'x 606, 615 (6th Cir. 2010) (noting that this "determination is a fact-specific inquiry, guided by common sense"). Plaintiff argues that the number of "rug-inspector helper" jobs identified by the VE and adopted by the ALJ (450 jobs regionally, 18,000 jobs statewide, and 250,000 jobs nationally) is "dubious" given that the DOT has not been updated since 1991. (*See* Doc. 11-2, Tr. 74 at PAGEID #: 116; *id.*, Tr. 27 at PAGEID #: 69; Doc. 12 at 17, PAGEID #: 770).

In support of this argument, Plaintiff contrasts the number of jobs identified with a similar category within the more-recent Standard Occupational Classification ("SOC") system used to classify workers within the Department of Labor's Occupational Information Network ("O*NET"). (Doc. 12 at 18, PAGEID #: 771). Plaintiff explains that the corresponding SOC code for the "rug-inspector helper" position is "Helpers—Production Workers, SOC code 51-9198.00" which "contains within it numerous related occupations, including dishwashers, landscaping and groundskeeping workers, welders, cutters, and welder fitters, packaging and filling machine operators, sewing machine operators, meat packers, and molding and casting workers." (*Id.*).

The O*Net summary for "Helpers—Production Workers," shows declining employment, with 419,000 nationwide employees nationwide and 20,390 employees in Ohio in 2014. Comparing the VE's numbers to the O*Net summary numbers for "Helpers—Production

Workers," 18,000 of the 20,390 people in Ohio working under the corresponding SOC code, which includes numerous related occupations, would be "rug-inspector helpers." (Doc. 11-2, Tr. 74 at PAGEID #: 116); *see* SOC code 51-9198.00—Helpers—Production Workers, https://www.onetonline.org/link/summary/51-9198.00. According to Plaintiff, this is "patently absurd, and cannot be substantial evidence supporting the ALJ's decision to deny benefits." (Doc. 12 at 19, PAGEID #: 772). For its part, Defendant "stand[s] by the numbers given by the VE." (Doc. 20 at 20, PAGEID #: 832).

The Sixth Circuit has instructed that when information in the DOT appears to be out-of-date, "common sense dictates" that a more recent source of information should be consulted. *Cunningham*, 360 F. App'x at 615. For the reasons raised by Plaintiff, this Court cannot determine based on the current record whether substantial evidence supports the ALJ's conclusion that the "rug-inspector helper" position exists in substantial numbers. Consequently, the Court finds that remand is appropriate on Plaintiff's second assignment of error as well.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's nondisability finding and **REMAND** this case to the Commissioner and Administrative Law Judge ("ALJ") under Sentence Four of § 405(g).

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations

to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

      IT IS SO ORDERED.


Date:  April 7, 2017                        /s/ Kimberly A. Jolson
                                                      KIMBERLY A. JOLSON
                                                      UNITED STATES MAGISTRATE JUDGE